1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9
10    CARL D. EDLUND, SR.,

11                        Plaintiff,

12          v.

13    JO ANNE B. BARNHART, Commissioner of
      Social Security,

14                        Defendant.

15
16

CASE NO.      C04-5451RBL

REPORT AND
RECOMMENDATION

Noted for July 22, 2005

17
18
19
20
21
22
23          Plaintiff, Carl D. Edlund, Sr., has brought this matter for judicial review of the denial of his
24    applications for disability insurance and supplemental security income ("SSI") benefits.  This matter has
25    been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local
26    Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261
27    (1976).  After reviewing the parties' briefs and the remaining record, the undersigned submits the following
28    report and recommendation for the Honorable Ronald B. Leighton's review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born on April 6, 1950. Tr. 113.  He has a seventh grade education and has past work experience as an unskilled worker. Tr. 350, 361, 581, 619.

Plaintiff originally filed applications for disability insurance and SSI benefits in late October 1986. Tr. 1, 309-19, 348.  His applications were denied at the initial level on January 7, 1987. Tr. 320-22, 348. Plaintiff did not request reconsideration or review of that denial. Tr. 348.  On January 29, 1993, plaintiff protectively filed a second application for disability insurance benefits, alleging disability as of June 30, 1991. T. 96-99, 323-27.  That application was denied at the initial level on July 1, 1993, and plaintiff again did not file for reconsideration or review. Tr. 110-12, 329-31, 348.

On October 29, 1993, plaintiff protectively filed a third application for disability insurance and SSI benefits, alleging disability as of June 15, 1991, due to multiple complaints, including back and knee pain, depression, and drug and alcohol abuse. Tr. 15, 113-15, 332-34.  That application was denied initially and on reconsideration. Tr. 125-29, 132-34.  Plaintiff requested a hearing, which was held before an administrative law judge ("ALJ") on June 29, 1995. Tr. 40.  At the hearing, plaintiff, represented by counsel, appeared and testified, as did a vocational expert and a lay witness. Tr. 40-92.

On December 4, 1995, the ALJ issued a decision, in which she found that while plaintiff's second application should be re-opened for good cause, there was no basis for doing so with respect to his initial applications. Tr. 12.  The ALJ also found plaintiff not disabled, because he remained capable of performing other jobs existing in significant numbers in the national economy. Tr. 12-21.  Plaintiff's request for review of the ALJ's decision was denied on February 19, 1998. Tr. 385-86.

Plaintiff sought judicial review of the ALJ's decision in the United States District Court.  On April 2, 1999, the district court affirmed that decision. Tr. 406-09.  Plaintiff appealed to the Ninth Circuit Court of Appeals, which, on August 9, 2001, reversed and remanded the ALJ's decision to the Commissioner for further administrative proceedings. Tr. 395-405.  Specifically, the Ninth Circuit found the ALJ erred in finding plaintiff had no severe mental impairment at step two of the disability evaluation process, and directed the ALJ to reconsider her step three and step five determinations. Id.  On July 10, 2002, the Appeals Council issued an order remanding the case to another ALJ for further administrative proceedings consistent with the Ninth Circuit's opinion. Tr. 391-92.

In the meantime, while his appeal of the prior ALJ's decision was pending, plaintiff apparently filed a fourth, fifth and sixth application for disability insurance and SSI benefits in August 1998, February 2000, and August 2001, respectively. Tr. 3e-3f, 349.  Plaintiff's fourth and fifth applications were denied initially and on reconsideration. Id.  However, his sixth application, which was for SSI benefits only, was granted in January 2002, and plaintiff was found disabled as of August 1, 2001. Tr. 3f, 349.

Pursuant to the July 10, 2002 remand order of the Appeals Council, a new hearing was held before a different ALJ on September 15, 2003. Tr. 746, 748.  At that hearing, plaintiff, represented by counsel, appeared and testified, as did a medical expert. Tr. 746-64.  A vocational expert also appeared, but did not testify. Tr. 349, 746.  On April 19, 2004, a supplemental hearing was held, at which another vocational expert appeared and testified. Tr. 765-73.  Plaintiff, along with counsel, appeared at that hearing as well, but did not testify. Tr. 349, 765.

On May 25, 2004, the second ALJ issued a decision, in which he consolidated all but plaintiff's initial applications to determine whether plaintiff was disabled at any time from June 15, 1991 (his alleged onset date of disability) through March 31, 1997 (his date last insured). Tr. 349, 351.  In that decision, the second ALJ determined plaintiff to be not disabled, specifically finding in relevant part that:

(1) at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity;

(2) at step two, plaintiff had "severe" impairments consisting of right knee degenerative joint disease, depression, a learning disorder, and alcohol and prescription drug dependence, in partial remission;

(3) at step three, plaintiff (i) met the requirements for those impairments listed in sections 12.02, 12.04 and 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1, in combination with drug and alcohol abuse, but was ineligible for disability benefits on that basis pursuant to 42 U.S.C. § 423(d)(2)(C) and 42. U.S.C. § 1382(a)(3)(J), and (ii) had no impairment or combination of impairments that met or equaled any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, in the absence of drug and alcohol abuse;

(4) at step four, plaintiff retained the residual functional capacity to perform a limited range of light work, with certain other non-exertional limitations, which precluded him from performing his past relevant work; and

(5) at step five, plaintiff (i) was not entitled to disability insurance benefits as he was capable of performing other jobs existing in significant numbers in the national economy, and (ii) as of April 6, 2000, was entitled to SSI benefits due to his age and "functional illiteracy."

Tr. 363-65.  It does not appear from the record that plaintiff filed a request for review of the second ALJ's

decision with the Appeals Council.  That decision, therefore, became the Commissioner's final decision after sixty days. 20 C.F.R. §§ 404.981, 404.1481.

On August 2, 2004, plaintiff filed a complaint with this court seeking judicial review of the second ALJ's decision. (Dkt. #1).  Plaintiff argues that decision should be reversed and remanded for an award of benefits for the following reasons:

(a)   the ALJ erred in evaluating the medical evidence in the record;

(b)   the ALJ erred in not finding plaintiff's anxiety disorder to be severe;

(c)   the ALJ erred in assessing plaintiff's credibility;

(d)   the ALJ erred in not assessing the credibility of the lay witness testimony;

(e)   the ALJ erred in assessing plaintiff's residual functional capacity; and

(f)   the ALJ erred in finding plaintiff capable of performing other jobs existing in significant numbers in the national economy.

Because of these errors, plaintiff further argues he is entitled to receive both disability insurance and SSI benefits as of June 15, 1991, his alleged onset date of disability.

The Commissioner agrees that this case should be remanded, but argues instead that it should be remanded for further administrative proceedings.  Specifically, the Commissioner asserts that remand for further administrative proceedings is required to obtain supplemental vocational expert testimony regarding plaintiff's functional limitations, and to conduct additional assessment of his alcohol and prescription drug addiction.  For the reasons set forth below, however, the undersigned recommends that the ALJ's decision be reversed and remanded for payment of benefits.

<u>DISCUSSION</u>

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision.  <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance.  <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision.  <u>Allen v. Heckler</u>, 749 F.2d

1    577, 579 (9th Cir. 1984).

2    I.    Plaintiff's Date Last Insured

3    To be entitled to disability insurance benefits, plaintiff "must establish that [his] disability existed on

4    or before" the date his insured status expired. Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998); see also

5    Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1460 (9th Cir. 1995) (social security

6    statutory scheme requires disability to be continuously disabling from time of onset during insured status to

7    time of application for benefits, if individual applies for benefits for current disability after expiration of

8    insured status).  Plaintiff's date last insured was March 31, 1997. Tr. 351.  Thus, he will not be found

9    disabled, and will not be entitled to disability insurance benefits, if he fails to establish he was disabled prior

10   to or as of that date. Tidwell, 161 F.3d at 601.

11   II.   The ALJ Improperly Evaluated the Medical Evidence in the Record

12   Plaintiff argues the ALJ erred in not crediting the opinions of Jeff Bremer, Ph.D., an examining

13   physician, that he had a "marked" limitation in his ability to tolerate work stress.  For the reasons set forth

14   below, the undersigned agrees.

15   A.    The Ninth Circuit's August 2001 Opinion

16   Following psychological evaluations he performed in early November 1993 and late October 1994,

17   Dr. Bremer opined that plaintiff was markedly impaired in his ability to respond appropriately to and

18   tolerate the pressures and expectations of a normal work setting. Tr. 227, 701.  In early April 1994, Dr.

19   Bremer further opined that plaintiff had a "poor or none" to fair ability to "[d]eal with work stressors." Tr.

20   237.  Plaintiff asserts that the Ninth Circuit, in its August 9, 2001 opinion remanding this case back to the

21   Commissioner, required the second ALJ to credit as true Dr. Bremer's findings that he had a "marked"

22   limitation in his ability to tolerate work stress.

23   This, however, is not what the Ninth Circuit actually required.  In its opinion, the Ninth Circuit did

24   note Dr. Bremer's November 1993 psychological evaluation and April 1994 work abilities assessment, as

25   well as another evaluation he performed in late March 1994. Tr. 398-99.  The Ninth Circuit then found that

26   based on the April 1994 assessment, the prior ALJ erred in determining that plaintiff had no severe mental

27   impairment. Tr. 404.  It is true the Ninth Circuit stated that "because the ALJ 'failed to provide adequate

28   reasons for rejecting the opinion of a treating or examining physician, we credit that opinion as a matter of

1    law.'" Tr. 405 (citing <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996)).

2          This last statement, however, must be read in the context of the Ninth Circuit's opinion as a whole.

3    Thus, for example, the court did not state that it was crediting as true Dr. Bremer's opinions that plaintiff

4    had marked limitations in his ability to tolerate work stress.  Indeed, the Ninth Circuit did not even mention

5    Dr. Bremer's late October 1994 psychological evaluation.  Rather, the Ninth Circuit merely held that given

6    Dr. Bremer's "uncontroverted diagnosis" of "symptoms of agitated depression and anxiety," the prior ALJ

7    lacked substantial evidence to dismiss plaintiff's claim of a severe mental impairment at step two of the

8    disability evaluation process. Tr. 403.

9          It was for this purpose only, therefore, that the Ninth Circuit credited the opinion and findings of Dr.

10   Bremer as true.  As can be seen in the court's discussion of its holding set forth in relevant part below,   the

11   Ninth Circuit clearly focused on the errors in the prior ALJ's step two analysis:

12            Accordingly, we find the ALJ committed reversible error and remand the case to the ALJ
              for the requisite Step 3 analysis. . . . Furthermore, the ALJ failed to factor Edlund's
13            mental impairments into her Step 5 analysis regarding Edlund's residual capacity to
              perform other jobs; significantly, the hypothetical that she posed to the vocational expert
14            with respect to the availability of positions meeting Edlund's requirements failed to
              include consideration of such impairments. . . .
15
              In sum, because Dr. Bremer's observations were uncontroverted, the ALJ was required
16            to provide clear and convincing reasons before rejecting them.  This she failed to do.  In
              particular, the ALJ erred in discarding the entirety of Dr. Bremer's report, including
17            portions that he deemed to be reliable.  Accordingly, the ALJ's decision lacks substantial
              evidence with respect to her finding that Edlund was not suffering from a severe mental
18            impairment.  As a result of the error, the ALJ failed to consider whether Edlund's
              symptoms of depression and anxiety amounted to a listed impairment under Step 3;
19            furthermore, she failed to factor such considerations into her Step 5 analysis regarding
              Edlund's residual physical and mental capacity to perform other jobs. . . .
20
              [W]e reverse the SSA's denial of benefits because the ALJ failed to apply the correct
21            legal standard in rejecting Dr. Bremer's psychological evaluation, and because her
              conclusion that Edlund did not suffer from a severe mental impairment was not supported
22            by substantial evidence.  On remand, the ALJ should reconsider her Step 3 and Step 5
              determinations in light of Edlund's demonstrated mental impairment.
23
24   Tr. 405 (footnote and citations omitted).

25          Thus, while the Ninth Circuit reversed the prior ALJ's step two determination that plaintiff had no

26   severe mental impairment based on that ALJ's erroneous evaluation of Dr. Bremer's April 1994 work

27   abilities assessment, it did not credit as true the specific functional limitation that plaintiff had a "marked"

28   limitation in his ability to tolerate work stress, nor did it state that any other specific limitations must be

     credited as true for purposes beyond that of the step two analysis.  Nevertheless, for the reasons set forth

1   below, the undersigned finds the second ALJ erred in failing to adopt that limitation.

2        B.     <u>The ALJ's Evaluation of the Medical Evidence</u>

3        The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

4   medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the

5   record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the

6   ALJ. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, therefore, "the ALJ's

7   conclusion must be upheld." <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d 595,

8   601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in

9   fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical

10  experts "falls within this responsibility." <u>Id.</u> at 603.

11       In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

12  supported by specific, cogent reasons." <u>Reddick</u>, 157 F.3d at 725.  The ALJ can do this "by setting out a

13  detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

14  thereof, and making findings." <u>Id.</u>  The ALJ also may draw inferences "logically flowing from the evidence."

15  <u>Sample</u>, 694 F.2d at 642.  Further, the court itself may draw "specific and legitimate inferences from the

16  ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

17       The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

18  either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

19  treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

20  legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31.  However, the

21  ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739

22  F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain

23  why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07

24  (3d Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

25       In general, more weight is given to a treating physician's opinion than to the opinions of those who

26  do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

27  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings."

28  <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th

Cir. 2001); Magallanes, 881 F.2d at 75.  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

Plaintiff argues the medical evidence in the record supports Dr. Bremer's opinion that plaintiff was markedly limited in his ability to respond appropriately to and tolerate the pressures and expectations of a normal work setting.  The ALJ, plaintiff asserts, improperly rejected much of the medical opinion evidence in the record that supports Dr. Bremer's opinion.  The undersigned agrees.

With respect to Dr. Bremer's opinions regarding plaintiff's ability to function, the ALJ specifically found in relevant part as follows:

> Dr. Bremer assigned a GAF for the claimant at 60, which only indicate[s] "moderate" symptoms or "moderate" difficulty in social, occupational or school functioning.  This reveals an inherent inconsistency with his assessment of functional limitations for the claimant such as "moderate" activities of daily living; "moderate to marked" difficulties in maintaining social functioning; and "frequent" deficiencies in concentration, persistence or pace.  Dr. Bremer also anticipated the claimant would have "repeated" episodes of deterioration in work or work-like setting [sic], if he does not receive comprehensive treatment.  Dr. Bremer noted generally the same degree of functional limitations when he completed a "Medical Assessment of Ability to Do Work-Related Activities (Mental)" [form] in April 1994 . . .

> I note that his assessment was made at a specific point in time when the claimant was abusing street drugs and claimed to be newly sober.  While the claimant may have had marked limitations briefly, the great weight of the evidence indicates that he has not been markedly impaired more than briefly, if at all and then only because of street drug abuse. . . .

> In reference to Dr. Bremer's opinion about "repeated" episodes of deterioration in work or work-like setting [sic], it appears Dr. Bremer would not reach the same conclusion in the absence of drugs or alcohol, as he added these "repeated" episodes would occur if the claimant does not receive comprehensive treatment. . . . Whereas an opinion anticipating such repeated episodes of decompensation of extended duration . . . may be reasonable in the context of ongoing substance dependence, the evidence does not support a conclusion that these particular episodes should be anticipated . . . in the absence of drug or alcohol.

> In sum, I find Dr. Bremer's opinion about the degree of functional limitations imposed by Mr. Edlund's impairments is inherently inconsistent with his own reports of findings based on the results of the intelligence test administered to the claimant . . . and his assessment of a GAF of 60 for the claimant.  Furthermore, Dr. Bremer's evaluation was made in the context of ongoing substance dependence, and "repeated episodes of decompensation, each of extended duration" would not be expected even under those circumstances.

Tr. 357-58.  Based on a review of the medical evidence in the record, the undersigned finds these are not

1   valid reasons for rejecting Dr. Bremer's opinions.

2        Although Dr. Bremer gave plaintiff a global assessment of functioning ("GAF") score of 60, it is not

3   clear this score is necessarily inconsistent with a finding that he is markedly limited in his ability to respond

4   to or tolerate the pressures and expectations of a normal work setting.  In any event, Dr. Bremer has been

5   consistent in finding plaintiff markedly impaired in this functional area.  As discussed above, Dr. Bremer

6   found plaintiff to be so impaired in early November 1993. Tr. 227.  In late March 2004, he also found

7   plaintiff to have "frequent" episodes of deterioration or decompensation in a work setting. Tr. 236.  In early

8   April 2004, Dr. Bremer noted that plaintiff had a "poor or none" to fair ability to deal with work stressors,

9   and "repeated" episodes of deterioration or decompensation. Tr. 237.

10       In late October 1994, Dr. Bremer performed another psychological evaluation, in which he again

11  found plaintiff markedly limited in his ability to respond to or tolerate the pressures and expectations of a

12  normal work setting. Tr. 701.  The ALJ did not even mention this evaluation in his opinion.  In October

13  2001, Dr. Bremer opined that plaintiff had a "severe" limitation in this functional area. Tr. 743.  Again, the

14  ALJ did not address this opinion.  It is possible that this opinion is too remote from the plaintiff's date last

15  insured to be relevant.  However, the existence of continuous disability may be shown by retrospective

16  diagnoses. <u>Flaten</u>, 44 F.3d at 1461 n.5; <u>Smith v. Bowen</u>, 849 F.2d 1222, 1225 (9th Cir. 1988) (retrospective

17  medical diagnoses made after period for disability are relevant to assess claimant's disability during that

18  period).  The ALJ, however, made no such finding either way.

19       As noted above, the ALJ also discounted Dr. Bremer's late November 1993 and early April 1994

20  opinions in part because they were made at a time when plaintiff was "abusing street drugs," and because

21  the "great weight" of the evidence in the record indicated he had "not been markedly impaired more than

22  briefly, if at all and then only because of street drug abuse." Tr. 357.  As discussed above, however, from

23  late November 1993 to early October 1994 (and even as late as October 2001), Dr. Bremer consistently

24  found plaintiff to be significantly impaired in his ability to respond to and tolerate work stress.

25       Other examining medical sources in the record, furthermore, have found plaintiff to be similarly

26  impaired.  For example, in both November 1995 and February 1999, Keith Krueger, Ph.D., opined that

27  plaintiff was markedly impaired in his ability to respond appropriately to and tolerated the pressures and

28  expectations of a normal work setting. Tr. 705, 719.  In November 1998, Dr. John Frederick felt plaintiff

1  would "have a difficult time coping with the stresses that might be encountered in the work place." Tr. 716.

2  Dr. Jagoda Pasic stated in September 2001, that plaintiff would have "significant difficulty" in performing

3  even simple and repetitive tasks, and that he was "unlikely" to show improvement within the next twelve

4  months, even with "the most aggressive treatment." Tr. 735-36.

5  The ALJ attempted to dismiss the psychological and psychiatric evaluations plaintiff received from

6  such medical sources by stating that they were "solely made by consultative examiners within the context of

7  his applications for general assistance and/or Social Security disability." Tr. 357.  However, this is hardly

8  the kind of specific and legitimate reason an ALJ is required to provide to reject the opinion of an examining

9  physician, let alone three of them.  In addition, the ALJ does not even mention Dr. Krueger's November

10  1995 opinion, or the September 2001 opinion of Dr. Pasic.[1]

11  The ALJ does appear to discount the credibility of Dr. Frederick's November 1998 evaluation and

12  Dr. Krueger's February 1999 evaluation in part on the basis that neither medical source appeared to make

13  use of "standard psychological testing." Tr. 355-56.  Again, however, this is not a valid reason for rejecting

14  either of their findings.  The lack of such objective testing alone is not a sufficient reason for rejecting the

15  opinion of an examining psychologist or psychiatrist.  See Sanchez v. Apfel, 85 F. Supp.2d 986, 992 (C.D.

16  Cal. 2000) (clinical and laboratory data may consist of diagnoses and observations of professionals trained

17  in field of psychopathology); Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987) (opinion based on

18  clinical observations supporting diagnosis of depression is competent evidence).

19  While there are opinions in the record from other non-examining medical sources indicating that

20  plaintiff had less than marked limitations in his ability to handle the stress of a workplace setting (See Tr.

21  650, 673, 678), the ALJ did not provide any evaluation of those opinions.   Even if the ALJ had properly

22  evaluated those opinions, however, the opinion of a non-examining physician may constitute substantial

23  evidence only if "it is consistent with other independent evidence in the record." Lester, 81 F.3d at 830-31;

24  Tonapetyan, 242 F.3d at 1149.  As noted above, the majority of the medical evidence in the record from

25  plaintiff's examining psychologists and psychiatrists indicated that plaintiff was markedly limited in his

26  ability to handle work stressors.

27  _____

28  [1]As with Dr. Bremer's October 2001 opinion, which, as discussed above, the ALJ failed to address, while there also may
be a question of relevance concerning Dr. Pasic's opinion because it was not provided until September 2001, again the ALJ made
no such finding either way here due to his failure to address it.

REPORT AND RECOMMENDATION
Page - 10

The weight of the evidence in the record, furthermore, also indicates plaintiff likely would continue to be markedly impaired in his ability to handle the stresses of the workplace, even in the absence of drug and alcohol abuse. In early November 1993, Dr. Bremer answered "yes" to the question of whether alcohol or drug treatment would likely decrease the severity of plaintiff's condition, and in late March 1994, he noted that plaintiff had "ongoing" drug dependence. Tr. 226, 236. However, Dr. Bremer also felt that plaintiff would benefit from "concurrent psychologic/psychiatric and chemical dependency counseling," and that it would be futile "to address one without the other." Tr. 236.

In late October 1994, although Dr. Bremer again opined that drug and alcohol treatment would decrease the severity of plaintiff's condition, he felt that it would do so "only with concurrent psychologic and psychiatric support," and that even with drug and alcohol abstention, plaintiff would still be "anxious and depressed." Tr. 700. Evidence from other medical sources in the record further indicate that plaintiff's mental functional impairments were not solely caused by his drug and alcohol abuse. In November 1995, for example, Dr. Krueger assessed plaintiff with a generalized anxiety disorder. Tr. 704. Dr. Krueger was not certain, however, whether this was caused by plaintiff's substance abuse. Id. He did not think alcohol or drug treatment was likely to decrease the severity of plaintiff's condition, and thus felt abstinence would have "fairly little" effect on it. Id. Indeed, far from exacerbating plaintiff's condition, Dr. Krueger thought his substance abuse might "actually calm his anxiety." Tr. 705.

Dr. Frederick deemed plaintiff's alcohol dependence to be in partial remission in November 1998, and, indeed, felt his "alcohol issues" were no longer contributing to his difficulty in functioning. Tr. 716. Dr. Pasic also noted plaintiff's alcohol dependence to be in remission in September 2001, but still found him to have significant functional limitations that he estimated would last for longer than twelve months. Tr. 735-36. While John Robinson, Ph.D., a non-examining physician, opined in November 2001, that it was not possible to separate out plaintiff's alcohol and drug abuse from his anxiety and depressive symptoms, and that such abuse exacerbated his other disorders, he felt strict adherence to drug and alcohol treatment would only "somewhat" improve plaintiff's work capacities. Tr. 671, 675, 679.

In addition, although one medical source did state in February 2002, that due to a lack of "totally and consistently sober data" about his functioning, it was unclear whether plaintiff's over-all functioning would improve "were he to be sober," the medical expert, Dr. Sally Clayton, testified that plaintiff's social

functioning likely still would have been "markedly impaired" back in 1994. Tr. 683, 758.  She testified that this was so, even though she also testified that he was "markedly impaired cognitively and socially" at that time due to his substance abuse as well. Tr. 762.   For this reason, Dr. Clayton testified, plaintiff still would have benefitted from mental health treatment. Tr. 758.

While it is true, furthermore, Dr. Bremer did state that plaintiff would have repeated episodes of deterioration or decompensation "without comprehensive treatment," as discussed above, the treatment Dr. Bremer recommended that he undergo included both "psychologic/psychiatric and chemical dependency counseling." Tr. 236.  In other words, the evidence in the record fails to clearly indicate that Dr. Bremer "would not reach the same conclusion in the absence of drugs or alcohol." Tr. 357.  As such, this reason for rejecting Dr. Bremer's findings also is invalid.  Finally, although the ALJ discounted Dr. Bremer's opinion in part "based on the results of the intelligence test" he administered (Tr. 358), the ALJ failed to explain how such testing reflected adversely on Dr. Bremer's findings regarding plaintiff's functional limitations, especially in light of the other medical evidence in the record discussed above.

Defendant argues, however, that in addition to the reasons provided above, the ALJ properly did not adopt Dr. Bremer's findings, because there is no evidence in the record plaintiff received any mental health counseling, although he was advised to do so by Dr. Bremer. Tr. 357.  Dr. Bremer did note in late October 1994, that plaintiff was not currently receiving any mental health services, even though he had recommended such services in late March 2004. Tr. 236, 702.  He also noted though, that conditions which could impair plaintiff's ability to cooperate with treatment included: "treatment not reasonably available," and "difficulty accessing treatment." Tr. 702.  In October 2001, Dr. Bremer further stated that while mental health treatment "[p]ossibly" would restore or substantially improve plaintiff's ability to work, it would be "long term," and he still would be impaired for more than twelve months. Tr. 744.[2]

Both Dr. Bremer and Dr. Krueger did note that motivation was an issue for plaintiff with respect to his ability to pursue mental health treatment. Tr. 702, 706.  However, plaintiff also reported in November 1995, having had some trouble accessing mental health counseling. Id.  In February 1999, furthermore, Dr.

---

[2]Dr. Clayton did question Dr. Bremer's findings regarding plaintiff's condition at that time. Tr. 759-62.  However, the ALJ discussed neither Dr. Bremer's October 2001 opinion nor Dr. Clayton's critique of those findings.  A non-examining physician's opinion, furthermore, may constitute substantial evidence for rejecting the opinion of an examining physician only if "it is consistent with other independent evidence in the record." Lester, 81 F.3d at 830-31; Tonapetyan, 242 F.3d at 1149.

1   Krueger expressed uncertainty as to whether plaintiff would be helped by mental health treatment, and felt

2   that even if he was so helped, it would be "slow going." Tr. 720.  Indeed, Dr. Pasic felt that "[e]ven with

3   the most aggressive treatment," his condition was "unlikely" to show improvement within the next twelve

4   months. Tr. 735-36.  Thus, this too is not a legitimate reason for rejecting Dr. Bremer's findings.

5   III.   The ALJ Erred in Not Finding Plaintiff's Symptoms of Anxiety to Be "Severe"

6          To determine whether a claimant is entitled to receive disability benefits, the ALJ engages in a five-

7   step sequential evaluation process. 20 C.F.R. § 404.1520.  At step two of this process, the ALJ must

8   determine if an impairment is "severe". Id.  An impairment is "not severe" if it does not "significantly limit"

9   a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a);

10  Social Security Ruling ("SSR") 96-3p.  Basic work activities consist of those "abilities and aptitudes

11  necessary to do most jobs." 20 C.F.R. § 140.1521(b); SSR 85- 28; SSR 96-3p.

12         An impairment is not severe only if the evidence establishes a slight abnormality that has "no more

13  than a minimal effect on an individual['] ability to work." See SSR  85-28; Smolen v. Chater, 80 F.3d

14  1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  In other words, the step

15  two severity determination is merely "a de minimis screening device to dispose of groundless claims."

16  Smolen, 80 F.3d at 1290.  Plaintiff has the burden of proving his "impairments or their symptoms affect his

17  ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001);

18  Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).

19         Plaintiff argues the ALJ erred by failing to find his diagnosed symptoms of anxiety to be severe.  The

20  undersigned agrees.  The ALJ found "no reason to conclude" plaintiff "had a medically determinable severe

21  Generalized-Anxiety Disorder." Tr. 355.  Specifically, the ALJ found that with respect to the diagnosis of

22  that disorder provided by Dr. Frederick, it had "not been confirmed by the use of standardized testing." Id.

23  With regard to the diagnosis of that disorder provided by Dr. Krueger, the ALJ, in addition to rejecting it

24  because of a lack of standardized testing, also rejected it because it was based "on the history of the

25  claimant." Tr. 356.  As explained above, however, neither of these reasons are sufficient to reject to the

26  opinion of an examining psychologist or psychiatrist.

27         The medical evidence in the record, furthermore, indicates that plaintiff's anxiety symptoms have

28  had more than a minimal effect on his ability to perform work-related activities.  In early November 2003,

1   Dr. Bremer rated the severity of plaintiff's "[v]erbal expression of anxiety or fear" as "marked" (defined as a

2   "[v]ery significant interference with basic work-related activities"). Tr. 226.  In late March 2004, Dr.

3   Bremer found plaintiff to be "markedly depressed and anxious," noting also that he was suffering from

4   significant mental functional limitations. Tr. 236.

5        In both November 1995 and February 1999, Dr. Krueger also rated the severity of plaintiff's verbal

6   expression of anxiety or fear as being "marked." Tr. 704, 718.  Other medical sources in the record have

7   diagnosed plaintiff with various anxiety-related disorders and limitations as well. See Tr. 643, 652, 668,

8   735.  In light of the *de minimis* nature of the step two screening process, the undersigned thus finds the ALJ

9   erred in determining plaintiff to have no severe anxiety-related impairment.

10   IV.    The ALJ Properly Evaluated Plaintiff's Credibility

11        In his opening brief, plaintiff argues the ALJ erred by making no finding as to the credibility of his

12   testimony.  Then, in reply to defendant's responsive brief, plaintiff does state correctly that the ALJ did

13   evaluate his credibility, but nevertheless still argues that such evaluation was erroneous.  While plaintiff

14   ordinarily must do more than make a bare assertion of error in his opening brief so as to provide defendant

15   with an adequate opportunity to respond, because the undersigned finds the ALJ did not err in evaluating

16   plaintiff's credibility, the issue of plaintiff's credibility will be addressed below.

17        Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

18   639, 642 (9th Cir. 1982).  The court should not "second-guess" this credibility determination.  Allen, 749

19   F.2d at 580.  In addition, the court may not reverse a credibility determination where that determination is

20   based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

21   claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long

22   as that determination is supported by substantial evidence.  Tonapetyan, 242 F.3d at 1148.

23        To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

24   disbelief."  Lester, 81 F.3d at 834 (citation omitted).  The ALJ "must identify what testimony is not credible

25   and what evidence undermines the claimant's complaints."  Lester, 81 F.3d at 834; Dodrill v. Shalala, 12

26   F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's

27   reasons for rejecting the claimant's testimony must be "clear and convincing."  Lester, 81 F.2d at 834.  The

28   evidence as a whole must support a finding of malingering.  O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th

Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if he or she "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7. The claimant need not be "utterly incapacitated" to be eligible for disability benefits, and "many home activities may not be easily transferable to a work environment." Id.

Here, the ALJ discounted plaintiff's credibility in part because of his activities of daily living:

> In November 1998, the claimant stated he gets up at 5 o'clock and watches the morning news. He helps his girlfriend with the kids by changing diapers and feeding them, even though he does not cook very often. He does simple things around the house like taking out the garbage and doing yard work occasionally. When asked if he had any specific hobbies, he stated he works on bicycles, motorcycles and appliances around the house. (Exhibit 12F/82). Therefore, based on the claimant's own statements, I find he engages in activities of daily living that may exceed light level of exertion. In addition, his statements appear inconsistent with a finding of a sit/stand option at will. However, I decided to assign him a residual functional capacity for less than light level of exertion including a sit/stand option in consideration of his complaints associated with a non-severe degenerative disc disease of the lumbar spine as well has his severe degenerative joint disease of his right knee.

Tr. 360. In challenging this finding, plaintiff merely states that "[t]he first reason, that Mr. Edlund can occasionally perform activities of daily living around the house, has been addressed by the Ninth Circuit," citing to Benecke v. Barnhart, 379 F.3d 587 (9th Cir. 2004). Plaintiff's Reply Brief, p. 7. Such a statement, however, hardly rises above the "bare assertion" level reached in plaintiff's opening brief. Plaintiff has not shown how Benecke applies to the ALJ's recitation of his activities of daily living in this case.

The ALJ's findings regarding plaintiff's activities of daily living, furthermore, are well supported by the evidence in the record. See Tr. 159-61, 171, 221, 234, 435, 537, 543-44, 609-10, 637, 711-12, 715, 723. Even so, the ALJ gave plaintiff the benefit of the doubt regarding his physical limitations, assessing him with the ability to perform at an exertional level below that which his activities of daily living would otherwise indicate. As such, the ALJ did not err in his assessment of those activities.

REPORT AND RECOMMENDATION
Page - 15

Plaintiff next argues the ALJ erred in his evaluation of plaintiff's ability to socialize. With respect to that, the ALJ found as follows:

> Regarding socialization, the claimant noted in November 1998 that he occasionally socializes with his only friend. He stated that he finds it difficult to socialize with other people because of shyness. He does not belong to any group such as Alcoholics Anonymous, church, etc. His reason for this is that he simply has "no interest in meeting other people." (Exhibit 12F/82). In other words, he does not appear to have significant limitations to adequately socialize, but he has only chosen not to do so. In fact, Dr. Fredrickson stated there was no obvious impairment in the claimant's ability to interact with other people (Exhibit 12F/81). Despite that, I find he should be limited to no contact with the general public and occasional contact with co-workers mainly in consideration of his symptoms associated with depression and substance dependence.

Tr. 360. In challenging this finding, plaintiff focuses on the ALJ's characterization of his ability to interact with other people. Although, contrary to the ALJ's statements, the medical evidence in the record for the most part indicates plaintiff has significant limitations in his ability to function socially (See Tr. 227, 236, 238-39, 650, 652, 673, 678, 705, 716, 719, 736, 743), those limitations in general have been rated marked in terms of interacting with the general public, and moderate with respect to co-workers and supervisors. See Id. As such, the contact limitations the ALJ placed on plaintiff appear to be appropriate.

Plaintiff also challenges the ALJ's findings concerning his alleged inability to concentrate. Those findings read as follows:

> In reference to Mr. Edlund's ability to sustain concentration, he noted he could not watch a TV show for more than two hours because "concentration would make it hard to watch" as he would begin to worry about other things. (Exhibitbe 12F/82). In other words, it appears he gets distracted rather than unable to concentrate as a result of his mental impairments. In any event, I assigned limitations for simple and repetitive tasks as part of his mental residual functional capacity in order to address any reasonable limitation he may have had during the period under consideration as far as his ability to sustain concentration.

Tr. 360. The medical evidence in the record reveals that in general plaintiff has been found "moderately" limited in his ability to maintain concentration. See Tr. 227, 236-37, 649, 673, 677, 701, 705, 719, 736, 743. Thus, while plaintiff does appear to have real limitations in his ability to concentrate, the ALJ did not err in restricting him to simple and repetitive tasks.

Lastly, the ALJ discussed plaintiff's credibility in light of his work record:

> The claimant stated in November 1998 that he lost his last two jobs because of not being able to keep up the pace as a dishwasher and not being able to learn new techniques in a leather-cutting job (Exhibit 12F/82). First, I recognize his dishwasher job may have probably required standing for longer than he could do it considering his severe and non-severe physical impairments. Second, I acknowledge his leather-cutting job may have required a mental capacity for more than unskilled work. Therefore, my findings of a

residual functional capacity for less than light level of exertion with non-exertional limitations including a sit/stand option at will and simple repetitive tasks would take care of the limitations he noted on his last two jobs. However, these limitations do not preclude other kinds of jobs.

Tr. 360. Plaintiff argues the ALJ "explained these failures away as not indicative of future success in less difficult jobs." Plaintiff's Reply Brief, p. 8. The fact that he tried, but failed, to work in the past, plaintiff asserts, supports his allegations of disabling impairments. However, plaintiff points to nothing in the record to indicate his failure to continue performing these two jobs reflect greater limitations on his ability to do work than the ALJ placed on him. Indeed, the medical evidence in the record (or, perhaps more appropriately, the lack thereof) concerning plaintiff's alleged disabling physical limitations, as well as his activities of daily living, supports the ALJ's findings on this issue. See Tr. 216-17, 220-21, 223-24, 264-66, 433-38, 440, 442, 448, 633-37, 685-88, 695-97, 708-11, 721-25, 727-31, 738, 740.

V.      The ALJ Erred in Not Assessing the Credibility of the Lay Witness Testimony

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). An ALJ may discount lay testimony if it conflicts with the medical evidence. Id.; Vincent, 739 F.3d at 1395. In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512. The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

Plaintiff argues that although the ALJ referenced the lay witness testimony in the record, he gave no reasons for rejecting that testimony. Indeed, a review of the ALJ's decision shows that although the ALJ did mention the lay witness who testified at the June 1995 administrative hearing (Tr. 359), he provided no analysis whatsoever of her testimony. As such, the ALJ erred.

VI.     The ALJ Erred in Assessing Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p. A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine

1   whether he or she can do other work. Id. at *2.  The residual functional capacity assessment thus is what

2   the claimant "can still do despite his or her limitations." Id.

3         A claimant's residual functional capacity is the maximum amount of work the claimant is able to

4   perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

5   must result from his or her "physical or mental impairment(s)." Id.  The ALJ, therefore, must consider only

6   those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

7   claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

8   related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

9   medical or other evidence." Id. at *7.

10        The ALJ found plaintiff had the residual functional capacity to perform "a limited range of light

11  exertion work," with a sit/stand option. Tr. 360-61.  The ALJ further limited plaintiff to no contact with the

12  general public and occasional contact with co-workers, and to the ability to perform simple and repetitive

13  tasks. Tr. 360.  As discussed above, the ALJ did not err in limiting plaintiff to simple and repetitive tasks in

14  light of the medical evidence in the record concerning his moderate limitations in concentration.  Plaintiff

15  argues, however, that the ALJ was required to include specific reference to those limitations, and not just

16  indicate that he was limited to simple and repetitive tasks.

17        In support of this assertion, plaintiff relies on Newton v. Chater, 92 F.3d 688 (8th Cir. 1996).[3]  That

18  case, however, is distinguishable on its facts from the case at hand.  In Newton, the Eighth Circuit held that

19  the hypothetical question the ALJ posed to the vocational expert should have included a specific reference

20  to the claimant's deficiencies in concentration, persistence and pace. Id. at 695.  The Commissioner argued

21  that the ALJ's limitation to simple work was sufficient. Id.  In rejecting this argument, the court of appeals

22  stated in relevant part:

> The Commissioner contends that these deficiencies did not have to be included in the
> hypothetical question because the question limited Newton's capabilities to simple jobs.
> She notes that Drs. Scott and McDonough concluded that Newton's concentration
> problems did not significantly limit his abilities to follow short and simple instructions
> and make simple work-related decisions, and that Dr. Domingo determined Newton

---

[3]The undersigned notes that plaintiff also has cited to several unpublished district court decisions from other districts both with respect to the issue of his assessed residual functional capacity and the issue of the ALJ's step five analysis. Unpublished decisions from other circuits and other district courts, however, are not binding on this court. See Rule 36-3 of the United States Court of Appeals for the Ninth Circuit.  Nor has plaintiff explained why those decisions are especially persuasive or provided any reasons why this court should follow them.

REPORT AND RECOMMENDATION
Page - 18

could maintain concentration for simple work.

> The vocational expert stated on cross-examination, however, that Newton's concentration and persistence problems related to basic work habits needed to maintain employment. A moderate deficiency in these areas, the expert testified, would cause problems on an ongoing daily basis, "regardless of . . . what the job required from a physical or skill standpoint." The expert's original response to the hypothetical question may thus have been different if the question had already described all of Newton's functional limitations.

Id.  The court in Newton therefore relied on the vocational expert's testimony to find that the limitation to simple work was insufficient.  Here, on the other hand, there is no such testimony or other evidence that indicates the ALJ's limitation to simple, repetitive work is inappropriate.

Plaintiff also argues the ALJ erred in not including "functional illiteracy" in the assessment of his residual functional capacity.  The undersigned agrees.  While the ALJ stated that plaintiff's seventh grade education was not deemed to be "illiteracy" under the Social Security Regulations, he nevertheless relied on Dr. Bremer's October 2001 opinion that plaintiff was functionally illiterate in finding him disabled as of April 6, 2000, and therefore entitled to SSI benefits. Tr. 362-65.  Although Dr. Bremer did not render his opinion regarding plaintiff's illiteracy until October 2001, it would be illogical to find that plaintiff was not so limited prior to that date (and, presumably, he has been so for his entire life).  Thus, the ALJ erred in not including this limitation in his assessment of plaintiff's residual functional capacity.

VII.   The ALJ Improperly Found Plaintiff Not Disabled at Step Five of the Disability Evaluation Process

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by

1   the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that

2   description those limitations he finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)

3   (because ALJ included all limitations that he found to exist, and those findings were supported by

4   substantial evidence, ALJ did not err in omitting other limitations claimant failed to prove).

5          The ALJ posed the following hypothetical question to the vocational expert:

6          I want to describe a hypothetical person to you.  And that's a 54 year old male, with a
       seventh grade education, the same past work as we have present in this case.  This
7          hypothetical person is generally limited to light exertion.  Would need to sit or stand at
       will.  Should avoid contact with the public, but can have occasional contact with co-
8          workers.  And would be limited to simple, repetitive tasks.

9   Tr. 769.  Plaintiff argues the ALJ erred in not including the limitation that he had moderate deficiencies in

10  concentration, persistence and pace.  As discussed above, however, the ALJ did not err in only including in

11  plaintiff's residual functional capacity the restriction that he was limited to simple, repetitive work.  Thus, he

12  did not err in only including that limitation in the hypothetical question as well.

13         On the other hand, also as discussed above, the ALJ did improperly reject Dr. Bremer's findings that

14  plaintiff was markedly limited in his ability to handle work stressors, and failed to include plaintiff's

15  "functional illiteracy" in his residual functional capacity assessment.  Accordingly, the ALJ should have

16  included those limitations in the hypothetical question he posed to the vocational expert.  In response to

17  questioning from plaintiff's attorney, furthermore, the vocational expert testified that an individual who is

18  markedly limited in his ability to respond appropriately to and tolerate the pressures of a normal workday

19  "would have difficulty maintaining employment." Tr. 771-72.

20         In addition, plaintiff argues that based on the ALJ's assessment of his residual functional capacity, he

21  is precluded from being able to perform the jobs identified by the vocational expert.  The vocational expert

22  testified that based on the ALJ's hypothetical question, plaintiff would still be able to perform the jobs of

23  laundry folder, small product assembler and semi-conductor assembler. Tr. 770.  The vocational expert

24  further testified that none of these jobs require the ability to read more than simple instructions. Tr. 771.

25  Plaintiff asserts, however, that by limiting him to simple, repetitive work, the ALJ in effect was limiting him

26  to "Level 1" reasoning, whereas the Dictionary of Occupational Titles ("DOT") defines each of these jobs

27  as requiring at least "Level 2" reasoning.

28         The DOT defines Level 1 through 3 reasoning as follows:

LEVEL 3

Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

LEVEL 2

Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

LEVEL 1

Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

DOT, Appendix C. Given these definitions, it does appear that the ALJ's limitation to simple, repetitive work is more analogous to Level 1 reasoning, than it is to Level 2 or Level 3 reasoning.

As discussed above, in response to the ALJ's hypothetical question, the vocational expert testified that plaintiff could perform the job of laundry folder. Tr. 770. The DOT defines the job of laundry "folder" (DOT 369.687-018) to involve Level 2 reasoning.[4] The vocational expert then found plaintiff could do the job of small product assembler, citing to DOT 739.687-030, which more specifically is titled "Assembly, Small Products II." Id. Again, the DOT defines this job to require Level 2 reasoning.[5] DOT 739.687-030. Finally, the vocational expert testified that plaintiff was capable of performing the job of semi-conductor assembler, this time citing to DOT 726.687-010 (Tr. 770), for which the DOT requires Level 2 reasoning.[6] Thus, it does appear that plaintiff is precluded from performing any of these jobs, given his limitation to simple, repetitive work.

Plaintiff argues the ALJ erred further by not resolving the conflicts discussed above between the vocational expert's testimony and the DOT's job descriptions. The undersigned agrees. The ALJ has the

---

[4]Plaintiff cites to the DOT's definition of "laundry worker" (DOT 302.685-010) to support his argument. The vocational expert, however, was in fact referring to the job of laundry "folder." Tr. 770. Irregardless, as defined by the DOT, both of these jobs require Level 2 reasoning.

[5]Here, plaintiff cites to the DOT's definition of "Assembler, Small Products I" (DOT 706.684-022), most likely because the vocational expert did not specify whether she was referring to the I or II position, although she did cite to the DOT number for the II position. Tr. 770. Again, however, both jobs are defined by the DOT as requiring Level 2 reasoning.

[6]DOT 726.687-010 actually refers to the job of "electronics worker." The job of semiconductor assembler instead is defined under DOT 726.684-034, which requires Level 3 reasoning. However, the court does not find this discrepancy to be significant here, as with either job more than Level 1 reasoning is required.

affirmative responsibility to ask the vocational expert about possible conflicts between her testimony and information in the DOT. Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999); SSR 00-4p.  Before relying on evidence obtained from a vocational expert to support a finding of not disabled, therefore, the ALJ must "elicit a reasonable explanation for any discrepancy" with the DOT. Haddock, 196 F.3d at 1087; SSR 00-4p.  Thus, the ALJ should have resolved these apparent conflicts before relying on the vocational expert's testimony.

VIII.   This Case Should Be Remanded for an Award of Benefits

The court may remand a case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Id.; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).

Here, the record is complete, there are no remaining issues to resolved, and it is clear that the ALJ would be required to find plaintiff disabled based on the evidence in the record.  Defendant concedes the reasoning levels required by the jobs identified by the vocational expert exceed plaintiff's limitation to performing simple, repetitive work, but nevertheless argues this case should be remanded for supplemental vocational expert testimony to resolve those inconsistencies.  The government, however, has had its bite at the apple.  It had the burden at step five of the disability evaluation process to find other jobs existing in the national economy that plaintiff could do, but failed to carry that burden.  This case should not be remanded solely to provide the government with another bite at that apple.

Defendant also argues that the evidence in the record suggests plaintiff should be precluded from eligibility for disability benefits because of drug and alcohol abuse, and that, therefore, this case should be remanded for further assessment of that issue.  Under the Social Security Act, a claimant may not be found disabled if alcoholism or drug addiction would be "a contributing factor material to the Commissioner's determination" that the claimant is disabled. Bustamante v. Massanari, 262 F.3d 949, 954 (9th Cir. 2001) (citing 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J)).  Similarly, the Social Security Regulations also require

1   that the Commissioner determine whether "drug addiction or alcoholism is a contributing factor material to

2   the determination of disability." Id. (citing 20 C.F.R. §§ 404.1535(a), 416.935(a)).

3        To determine whether a claimant's alcoholism or drug addiction is a materially contributing factor,

4   the ALJ first must conduct the five-step disability evaluation process "without separating out the impact of

5   alcoholism or drug addiction." Id. at 955.  If the ALJ finds the claimant is not disabled, "then the claimant is

6   not entitled to benefits." Id.  If the claimant is found disabled "and there is 'medical evidence of [his or her]

7   drug addiction or alcoholism,'" the ALJ proceeds "to determine if the claimant 'would still [be found]

8   disabled if [he or she] stopped using alcohol or drugs.'" Id. (citing 20 C.F.R. §§ 404.1535, 416.935).  Thus,

9   if a claimant's current limitations "would remain once he [or she] stopped using drugs and alcohol," and

10   those limitations are disabling, "then drug addiction or alcoholism is not material to the disability, and the

11   claimant will be deemed disabled." Ball v. Massanari, 254 F.3d 817, 821 (9th Cir. 2001).

12        Here, although the ALJ did not expressly refer to this two-part inquiry, he did proceed to determine

13   whether or not plaintiff was disabled both with his drug and alcohol abuse and then without it.  Thus, for

14   example, while the ALJ found plaintiff disabled at step three of the disability evaluation process with drug

15   and alcohol abuse, he determined that he would not disabled without it. Tr. 357.  Furthermore, as discussed

16   above, the medical evidence in the record indicates that plaintiff would continue to be markedly impaired in

17   terms of social functioning and his ability to tolerate work stressors, even without the influence of drug and

18   alcohol abuse.  Also as discussed above, given those limitations and based on the vocational expert's

19   testimony, it appears that plaintiff would not be able to sustain employment.  Accordingly, the undersigned

20   sees no point in sending this matter back for further evaluation of this issue.

21                                       CONCLUSION

22        Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff

23   was not disabled, and should remand this case to the Commissioner for an award of disability insurance and

24   SSI benefits beginning as of June 15, 1991.

25        Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

26   the parties shall have ten (10) days from service of this Report and Recommendation to file written

27   objections thereto.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

28   objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit

REPORT AND RECOMMENDATION
Page - 23

imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **July 22, 2005**, as noted in the caption.

DATED this 24th day of June, 2005.

Karen L. Strombom
United States Magistrate Judge